## Calvert's Heirs *vs* Nichols' Heirs.

### APPEAL FROM THE NICHOLAS CIRCUIT.

#### *Lost bond. Stale demand.*

CHIEF JUSTICE MARSHALL delivered the opinion of the Court—Judge Simpson did not sit in this case.

THIS bill was filed in February, 1820, by the heirs of John Nichols, who died about the year 1802 or 1803, against the heirs of Meredith Helm, to coerce the con-

veyance of 100 acres of land, alledged to have been sold by him to their ancestor. The sale is alledged to have been evidenced by a bond executed by Helm to Nichols, and which, as the bill states, came, upon the death of the latter, into the hands of his widow, and afterwards, of her second husband, Barns, by whom it is concealed or disposed of, so as not to be within their power. It is also alledged that ever since the date of the bond, the land has been in possession of Z. Calvert, for part of the time as tenant of Helm, and for a short time as tenant of the complainants. Calvert was made a defendant.. And the real contest has been between the complainants on the one side, and Z. Calvert, and his heirs since his death, on the other.

The bill does not state the contents of the bond, further than to say that it was for the conveyance, with general warranty, of 100 acres, part of 300 acres, &c. in the patent to Fitzgeral for 1000 acres, on the south side of the North fork of Licking, and seems to refer to the sales and conveyances made by Helm out of said 300 acres, as fixing the bond upon the residue. An amended bill claims specifically a conveyance of 85 acres, as designated on a plat exhibited, which the complainants alledge had never been conveyed by Helm. This tract of 85 acres, seems to have been regarded by parties and witnesses, as the land in contest in the suit. But it appeared clearly that the 85 acres, had been in possession of Calvert and others, under a deed and claim of title from 1797 ; and that there could be no relief as to that part of the 300 acres. And Calvert's heirs were decreed to convey and surrender to the complainants 48 acres of land adjoining the 85 acres, and which had been conveyed to Z. Calvert by M. Helm in 1809, and held by him and his heirs ever since, and also to pay five years back rents upon the same.

Decree of the Circuit Court.

As there is no specific claim for this tract of 48 acres, but the claim by the amended bill is confined to the adjoining 85 acres; and as the defendants rely, among other things, upon lapse of time and the statute of limitations, it might be a serious question whether, in the first place the complainants had not, by their own plead-

CALVERT'S HEIRS
*vs*
NICHOLS' HEIRS.

ings, precluded themselves from any relief as to the 48 acres, and in the second place whether if they had not, the time relied on by the defendants would not, in the absence of any specific claim set up to the 48 acres run on to the final hearing and then operate as a bar. And although the bond, so far as its contents may be collected from this record, might very probably have included the 48 acres or a part thereof, yet it is obvious that a party might often be subjected to great surprise and injury, if after contesting to the end of the suit a specific claim confined to one piece of land, he may be decreed at the hearing, to give up another. But waiving these objections to the decree, and conceding that it might be sustained under the circumstances of this case, if the complainants had established a valid equity, subsisting at the commencement of their suit, covering the 48 acres, and available against the legal title of Calvert on the ground of notice, we are of opinion that the complainants have failed to establish these important facts with such reasonable certainty as would authorize the Chancellor to change the title and possession of land after so great a lapse of time.

The ground relied upon in the answer.

Calvert not only denies that he was ever in possession of the land as tenant of M. Helm or of the representatives of Nichols, and that he ever paid rent to either, but calls in question the existence of the alledged bond, and denies that he had ever heard of it except by information from others, which at the same time communicated the fact that Nichols himself, when offered as a witness for M. Helm in a suit respecting this land, had sworn that he once had a bond for it, but it was destroyed, and he had no expectation of any part of the land unless there should be a new contract. The fact that Nichols did make such statement on oath, is proved without contradiction in the present case. And although a single witness states that in 1806 or 1807, he, at the request of the widow of Nichols, presented to Calvert, and in order to prevent his purchasing the land, a copy of what purported to be a bond signed by some Helm, for conveying to Nichols 100 acres of land on the south side of the North Fork, &c., and that Calvert

then said he had heard of the bond before, but that Helm said $100 of the purchase money was unpaid and intended to sell the land again, and that he would buy it any how; this statement of a single witness, uncorroborated by any other circumstance or testimony, cannot, so far as it is inconsistent with the answer, outweigh its denial.

But supposing this statement to be true, does it prove that the copy referred to was taken from a bond executed by M. Helm, or that any such bond was ever executed by him after the destruction of the first, as sworn to by Nichols? Was the copy taken from an original paper or from a copy? The witness knew nothing and of course proved nothing as to these points. He does not even state the date inserted in either of the papers which he saw. And the only inference that can be drawn from his testimony as to the existance at that time, of a bond on Helm for the land, is such as may be founded on the words of Calvert, importing that he had heard of such a bond, but that Helm said $100 of the consideration remained unpaid and he would sell, &c. If Calvert said this and no more, it might be inferred that he had heard of the bond as a subsisting one, and that he understood the only ground of Helm's determination to sell again, was the non-payment of a part of the price. But the witness was not cross examined. He deposed to admissions or declarations made fourteen years before. He does not state that Calvert said nothing more. He may have misunderstood the declarations; or he may have forgotten or deemed unimportant, some portions of it. These considerations tend to weaken the effect of this testimony, and to impair the force of the inference deduced from it. But if it were absolutely certain that the witness had stated truly all that passed on the occasion referred to, the inference that Helm had executed a new bond to Nichols after the destruction of the old one, and that the only reason for disregarding it was that a part of the consideration was not paid, if arising at all upon the words proved, is too weak and uncertain to prove satisfactorily the existance of such a new bond in opposition to the numerous

CALVERT'S HEIRS
*vs*
NICHOLS' HEIRS.

In a suit in chancery for a decree for land in compliance with a bond alledged to be lost, tho' an affidavit of the loss of the bond may not be necessary to give the Court jurisdiction, it is necessary to authorize the admission of parol proof of the contents, unless waived.

circumstances in the case which give probability to a contrary presumption.

1. The first of these circumstances is, that no bond is produced, and although the bill makes a statement in excuse of its non-production, neither this statement nor any other cause for its non-production, is supported by the oath of any party or witness. It is true such oath was not necessary to give jurisdiction to the Court, but it was necessary, unless waived, to authorize the introduction of secondary evidence of the contents of the bond; and the want of it leaves the claim of the complainants, as founded upon the bond, subject to those unfavorable presumptions on which the rule requiring its production or a proper excuse for its absence, is founded.

2. Then there is no direct proof of the execution or existance of any second bond, the only evidence on the subject being the inference already referred to, and the statement of a witness that at a trial of the right of possession between Helm and his tenant, two or three years after the death of Nichols, Helm said he wanted the possession, that he might give it to the heirs of Nichols, to whom he had sold the land in his lifetime. This may have been a mere excuse for the coercive measures against his tenant, and the sale referred to may have been that evidenced by the bond which was destroyed.

3. Again; it appears that the widow and an adult son of Nichols, who administered on his estate, caused an inventory to be taken shortly after his death, of all his papers, and the witness who was engaged in taking the inventory, states that no such bond as is now set up, was then produced, nor does any witness intimate that he has seen any such since that time.

4. The widow and heirs of Nichols, one at least of the latter being an adult, and others presumably nearly or quite of age, lived in the vicinity of the land for some years after the death of Nichols. In 1805, the administrators received a written authority from M. Helm to collect the rent corn from Z. and Wm. Calvert, for some part of the 300 acres not ascertained by the evidence. In 1806 or 1807, the widow sent the copy of a bond to Z. Calvert as above noticed, thus showing

that she was disposed to assert some claim to the land. About the same time or before, Helm said he wanted the possession from his tenant for the heirs of Nichols, &c., and in 1808, the same tenant, by his directions, paid the rent of that year to Mrs. Nichols. These are the material circumstances relied on by the complainants to establish their claim. But if the authority to receive the rent of 1805 and 1808, and the purpose of Helm in trying to turn his tenant out of the possession in 1806 or 1807, should be taken as an acknowledgment on his part, of the right of the heirs to the land, or as intended to give them possession, and if they really had a subsisting bond or claim to a conveyance, why did they not get it? If there had remained $100 due on the bond, it would probably have been paid by the rents. And if it was not so paid but was still due, why did the creditor authorize the debtors to receive the rent, when he might take it for payment? Or if the payment was thus completed, why was not a conveyance made, or at least demanded from the vendor? And if Mrs. Nichols had the bond in 1806 or 1807, and a conveyance was due to her children and herself, why, instead of sending a copy to Calvert to prevent him from purchasing, did she not send her friend with the original to Helm, to forbid a sale to another, and to demand a compliance with his obligation?

5. It was two or three years after this appeal to Calvert, before he obtained a deed, or, so far as appears, made the purchase from Helm. And yet it does not appear that, either during that interval, when if there was any real claim in the heirs of Nichols, they had strong reasons to look to its enforcement, or at any time before or afterwards, until the commencement of this suit, any demand of a conveyance was made upon Helm or his heirs, or upon Calvert, or any claim to the land in any way asserted by or for the heirs of Nichols, until this bill was filed in 1820. This was eleven years after the actual violation of Helm's alledged bond by a conveyance to Calvert, thirteen or fourteen years after it was known that Helm intended to sell and Calvert to buy, and seventeen or eighteen years after the death of

The Court refuse a conveyance of land upon a bond alledged to be lost, when there was not direct proof of its execution, and great delay in asking a conveyance, and no oath of the loss of the bond, or of its contents, or as to identity of the lands claimed.

Nichols. This long continued silence and absolute quiescence, however unaccountable, would not, it is true, be in itself, a bar to relief upon the bond if it were produced, nor perhaps upon the claim made without the bond, if its execution, and existance, and contents, and loss were sufficiently proved either directly or circumstantially. But when the bond is not produced nor its absence accounted for, and the complainants seek to disturb the title and possession of the defendants upon loose inferences as to the execution of a second bond, or vague conjectures as to the continued obligation of the first in contradiction of their ancestor's solemn oath, every presumption against their claim is entitled to consideration, and their long and unexplained silence when there was no impediment to the assertion and enforcement of their claim if it was just, leads almost irresistably to the inference that it has no real foundation.

The non-production of the bond unaccounted for, authorizes the presumption that it did not exist in a form available for the purposes of the complainants, and the contrary is not shown. We may, therefore, presume, or at least conjecture that the writing sent to Calvert in 1806 or 1807, was but the copy of a copy which may have been taken when the original was to be destroyed, or that if the original then existed, it bore evidence of its having been cancelled and perhaps of the terms of rescission; that the rents authorized to be received for the years 1805 and 1808, but which is not proved to have been received except for the latter year, was intended for re-payment of the original purchase, so far as it remained unrefunded, and that the notice from Mrs. Nichols to Calvert was rather founded upon and intended to intimate a supposed prior right to make the purchase, growing out of the original cancelled contract, than to assert an actual claim to the land under a subsisting obligation on the part of Helm. If this hypothesis be reconcileable with all the facts only upon the assumption that one or two witnesses may have misunderstood or failed to state all that they heard fourteen years before they deposed, the contrary hypothesis, that there was a valid subsisting bond or claim on the part

of the complainants at and after the death of their father, is still more irreconcileable with the undisputed and decisive facts, that the alledged bond is not produced nor its absence accounted for, nor its execution proved, nor its contents except vaguely, that the bond originally given was destroyed or cancelled, that no bond was found at the death of Nichols, and none seen by any witness since, that no demand of possession or title was made on Helm during his life, nor any attempt made to coerce a conveyance until seventeen or eighteen years after the death of Nichols; and that this suit, though brought in 1820, was permitted to remain on the docket without apparent urgency for trial, until after the death of Z. Calvert, presumed to have taken place about the year 1839, when the suit was revived against his heirs.

Under all the circumstances, we are of opinion that the complainants have not made out a case entitling them to a conveyance of any land from the heirs of Calvert, or to any part of the relief sought by their bill.

Wherefore, the decree is reversed and the cause remanded, with directions to dismiss the bill with costs.

*Hord* for appellants; *J. & W. L. Harlan* for appellees.